SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

**Sundiata Acoli v. New Jersey State Parole Board** (A-73-20) (083980)

**Argued January 31, 2022 -- Decided May 10, 2022**

**ALBIN, J., writing for the Court.**

In this appeal, the Court considers whether, as required by the statute that governs the determination of Sundiata Acoli's parole application -- N.J.S.A. 30:4-123.53, as it existed in 1979 -- the New Jersey State Parole Board has established "by a preponderance of the evidence that there is a substantial likelihood that [Acoli] will commit a crime if placed on parole."

On May 2, 1973, Acoli was driving with two fellow members of the Black Liberation Army, James Costan and Joanne Chesimard. All three were armed with handguns. Shortly before 1:00 a.m., New Jersey State Trooper James Harper stopped their car for a broken taillight. Acoli exited the car to speak with Trooper Harper. Almost simultaneously, Trooper Werner Foerster arrived on the scene as backup. Trooper Foerster frisked Acoli while Trooper Harper approached the car. While patting Acoli down, Foerster uncovered ammunition and a pistol. As Trooper Foerster was confronting Acoli, Chesimard shot Trooper Harper in the shoulder. A shootout ensued between Harper, Chesimard, and Costan. In the meantime, Acoli attempted to wrest Trooper Foerster's gun from him. In the course of that physical struggle, Acoli claims that Trooper Harper fired at him, grazing the top of his head and causing him to black out. According to Acoli, when he regained consciousness, Trooper Foerster's body was lying on the ground nearby and Acoli fled with Costan and Chesimard, both severely wounded.

In 1974, a jury found Acoli guilty of all charges brought against him for the murder of Trooper Foerster and the shooting of Trooper Harper. In total, he received an aggregate prison sentence of life plus twenty-four to thirty years. Under the law that controlled the crimes he committed in 1973, Acoli first became eligible for parole in 1993. N.J.S.A. 30:4-123.11 (repealed 1997). The Parole Board has denied Acoli parole every time he became eligible for release.

Acoli has lived the last forty-nine years in various federal prisons. After an early attempted escape and some minor infractions in the nineties, Acoli's record over more than a quarter century has been exemplary. The Federal Bureau of

1

Prisons has kept detailed records of Acoli's institutional progress, including his completion of 120 prison programs. Institutional progress reports and a report by a prison psychologist made during that time were favorable to Acoli.

Before Acoli's 2010 parole hearing, the State assigned Dr. Lois D. Goorwitz, a licensed psychologist, to assess Acoli's institutional progress. In Dr. Goorwitz's view, Acoli appeared remorseful, pointing to Acoli's expression of deep regret for his "part in Trooper Fo[er]ster's death." Dr. Goorwitz found "NO psychological contraindications to granting parole." She concluded that "it is time to seriously consider [Acoli] for parole." A two-member panel of the Parole Board recommended the denial of parole, giving little weight to Acoli's positive institutional record and largely disregarding Dr. Goorwitz's favorable report. The full Parole Board affirmed the denial.

In September 2014, the Appellate Division held that the Parole Board had failed to establish that there was a substantial likelihood that Acoli would reoffend if released and ordered that Acoli be placed on parole. The Court reversed on procedural grounds, holding that N.J.S.A. 30:4-123.55(f) required a full Parole Board hearing with witness testimony before Acoli could be released. Acoli v. State Parole Bd., 224 N.J. 213, 231-32 (2016).

Between his 2010 and 2016 hearings, Acoli remained infraction-free, continued to receive positive reports from prison staff, and completed twenty-four more programs. In advance of the 2016 parole hearing, the Board retained the services of a new licensed psychologist, Dr. Julia Van Pelt. Although Acoli's institutional record was exemplary during the six-year interim, Dr. Van Pelt arrived at completely different conclusions from those reached by Dr. Goorwitz.

In June 2016, the full Board conducted a hearing, calling only one witness -- Acoli. During approximately six hours of questioning, the then-seventy-nine-year-old Acoli spoke about his failing health, including his cardiac disease, difficulty hearing, and memory loss. Most of the questioning probed Acoli's recall of the 1973 Turnpike shooting. The Board repeatedly asked Acoli who shot Trooper Foerster, and, every time, Acoli responded that he did not know.

Toward the end of six hours of examination, Acoli was asked, "Who do you think killed Trooper Foerster?" (emphasis added). To that speculative question, Acoli answered, "I think [Trooper Foerster] was probably shot by Trooper Harper" while Acoli struggled with Foerster. Acoli's errant speculation elicited by the Board provided the basis for the Board's later claim that Acoli had changed his account of the shooting. The Board asked Acoli few questions about his decades-long infraction-free and model institutional record or about the dozens of programs he had completed (other than one, Criminal Thinking).

2

At the end of the hearing, Acoli explained, "I deeply regret the actions that transpired, those were turbulent and fearful times." He stated that if paroled, he would live with his daughter and grandchildren. After the hearing concluded, the Board denied Acoli parole.

A divided three-judge panel of the Appellate Division affirmed the decision of the Parole Board. 462 N.J. Super. 39 (App. Div. 2019). Emphasizing the deferential standard of review afforded to a decision of the Parole Board and the expertise the Board brings to bear, the panel majority concluded that "there is ample support in the record for the Board's determination that there is a substantial likelihood that Acoli will commit another crime . . . if the Board grants him parole." Id. at 66.

In dissent, Judge Rothstadt described the proceedings before the Parole Board as a "show hearing" that arrived at a "desired" result. Id. at 67-68, 77. Judge Rothstadt made clear that the Parole Board and the panel majority did not faithfully apply the Parole Act, which "effectively establishes a presumption in favor of parole." Id. at 71 (quoting In re Parole Application of Trantino (Trantino II), 89 N.J. 347, 355-56 (1982)). According to Judge Rothstadt, the Parole Board did not meet its burden of proving that Acoli "should not be released." Ibid. He concluded that the Parole Board unjustifiably overlooked and undervalued critical evidence that warranted the granting of parole. Id. at 77.

The case comes before the Court as an appeal as of right based on the dissent.

**HELD:** Under N.J.S.A. 30:4-123.53 (1979), at the time of Acoli's parole hearing, he was presumptively entitled to release; to overcome that presumption, the Parole Board had the burden of demonstrating that there was a substantial likelihood that, if released, Acoli would commit another crime. The Parole Board did not meet that burden. The record does not contain substantial credible evidence to support the Parole Board's decision to deny parole to Acoli. Accordingly, the Court is compelled to overturn the judgment of the Appellate Division and grant Acoli parole, consistent with his established release plan.

1. The discretionary power of the Parole Board is not unlimited or absolute. Trantino v. State Parole Bd. (Trantino VI), 166 N.J. 113, 173 (2001). When a parole decision is so far wide of the mark or so manifestly mistaken under the governing statutory standard, intervention is required in the interests of justice. Id. at 192. A Parole Board decision that either violates legislative policy, is not supported by "substantial evidence" in the record, or "could not reasonably have been made on a showing of the relevant factors" cannot be sustained. Trantino v. State Parole Bd. (Trantino IV), 154 N.J. 19, 24-25 (1998). (p. 31)

3

2.  The Parole Act of 1979 provides that an inmate, such as Acoli, "shall be released on parole at the time of parole eligibility, unless [it is shown] by a preponderance of the evidence that there is a <u>substantial likelihood</u> that the inmate will commit a crime . . . if released on parole at such time."  <u>Trantino VI</u>, 166 N.J. at 126.  Only when the risk of reoffending rises to "a substantial likelihood" may a parole-eligible inmate be denied parole.  The 1979 Parole Act shifted the burden to the State to prove that the prisoner should not be released, and it creates a protected expectation of parole in inmates who are eligible for parole.  The objective of the Act was to reduce the discretionary authority of the Board.  (pp. 32-33)

3.  Under the 1979 Parole Act, the Parole Board must assess a number of factors for the purpose of determining "what a man is and what he may become rather than simply what he has done."  <u>See</u> <u>Acoli</u>, 224 N.J. at 222 (quoting <u>Greenholtz v. Inmates of Neb. Penal & Corr. Complex</u>, 442 U.S. 1, 10 (1979)).  N.J.A.C. 10A:71-3.11(a) provides that the grant or denial of parole must "be based on the aggregate of all pertinent factors."  The regulation sets forth a list of 24 factors that the Parole Board "shall consider," in addition to other factors it may deem relevant, in making a parole decision.  <u>Id.</u> at (b).  Some of those factors include:  facts and circumstances related to the underlying crime; offenses and disciplinary infractions while incarcerated; participation in institutional programs and education programs; documentation reflecting personal goals, personal strengths or motivation for law-abiding behavior; mental and emotional health; parole plans; availability of community resources or support services; statements by the inmate reflecting on the likelihood that he will commit another crime; the failure to rehabilitate; history of employment and education; and statement or testimony of any victim.  <u>Ibid.</u>  The weight to be assigned to any one factor will depend on the unique history, background, and characteristics of the individual and the institutional record developed during years of incarceration.  That is because the punitive aspects of the sentence have been satisfied by the time an inmate is eligible for parole.  (pp. 33-35)

4.  In <u>Trantino VI</u>, the Court reversed the Parole Board's decision to deny parole to Thomas Trantino, who was convicted of murdering two police officers in 1963.  166 N.J. at 121-23.  The Court found that the Board had not abided by the statutory standard governing parole.  <u>Id.</u> at 192.  Stressing its previous finding that "there is evidence in the record that Trantino's memory loss is consistent, long-standing and genuine," <u>id.</u> at 177-78 (quoting <u>Trantino IV</u>, 154 N.J. at 35, 38), the Court determined that Trantino's inability to recall the specifics of the crime was not necessary to ensure Trantino would not reoffend upon release, <u>id.</u> at 178.  The Court also found the Board's "highly selective focus only on the psychological evidence supportive of its denial of parole, and its total disregard of evidence favorable to parole, undermine[d] the deference" to which it was normally entitled.  <u>Id.</u> at 188.  Finally, and more globally, the Court concluded that parole had been denied based "on the Board's selective and arbitrary reliance on only those portions of the record

that could possibly support the Board's conclusion." Id. at 189. The Court noted that the Board failed to adequately address "substantial evidence in the record, spanning many years of infraction-free incarceration and favorable psychological evaluations, that demonstrated Trantino's likelihood of success on parole." Ibid. "Because of the Parole Board's unjustifiable and 'obvious overlooking or undervaluation of crucial evidence,'" the Court held that its determination was "manifestly mistaken and must be set aside." Id. at 192. Recognizing that the grant of parole in any given case may be highly unpopular, this Court emphasized that "public outrage . . . has no place in a parole proceeding and is to be given no weight in a parole decision." Id. at 127 (quoting Trantino II, 89 N.J. at 376). (pp. 35-38)

5. With the principles of Trantino VI as a guide, the Court addresses the validity of the Parole Board's decision to deny Acoli parole. First, although the crime Acoli committed occurred forty-nine years ago, the Board's hyper-focus on Acoli's recollection of the events and its finding that his account lacked credibility became one of its critical justifications for denying parole. But to the extent that the Board relied on alleged inconsistencies in Acoli's account, the Board did not distinguish between the consistent accounts that Acoli had given based on his recollection and the speculation that the Board demanded as to who killed Trooper Foerster -- after Acoli had repeatedly stated that he did not know. The Board surely had the right to revisit the terrible deeds that Acoli had done. The Board, however, lost sight that its mission largely was to determine the man Acoli had become. The Board's narrow focus obscured the actual issue to be decided -- whether there was a substantial likelihood Acoli would reoffend if released. (pp. 38-43)

6. At the parole hearing, the Board members expressed no interest in: (1) the approximately 120 courses Acoli completed; (2) his extensive participation in counseling; (3) his above-average work evaluations; (4) the constructive rapport he displayed with prison staff and inmates; (5) the positive evaluations from the Federal Bureau of Prisons; (6) his assignment to the Honor Unit of his institution; (7) his instruction of younger inmates in a course on Critical Thinking in the federal prison system; and (8) his decades-long infraction-free record. Rather, the Board stated it "reviewed the entire record in rendering its decision" and then cursorily enumerated some generic mitigating factors. In short, the Board merely paid lip service to the mitigating factors favoring parole set forth in N.J.A.C. 10A:71-3.11(b). (pp. 43-45)

7. The Board made clear that its decision, in large part, was based on Acoli's performance at the hearing. But beyond belittling Acoli's presentation as "shallow and emotionless," the Board failed to explain what else Acoli might have said to persuade the Board of his sincerity. The Board refused to accept Acoli's words -- and, perhaps more importantly, his deeds, as evidenced by its disregard of his model behavior as an inmate. In light of Acoli's verbal renunciation of violence as an acceptable way to achieve social change; more than two decades infraction-free in

5

the federal prison system; the multitude of programs and counseling sessions he completed; his honor status as an inmate; his acquisition of vocational skills; and his advanced age, it is difficult to imagine what else might have persuaded the Board that Acoli did not present a substantial likelihood to reoffend. (pp. 45-49)

8. The Board's denial of parole to Acoli, moreover, was not supported by the overall psychological risk assessments. The Appellate Division reversed the Board's 2010 denial of parole based, in part, on Dr. Goorwitz's report. On remand and in the run-up to Acoli's 2016 parole hearing, the Parole Board retained a new psychologist, Dr. Van Pelt. Dr. Van Pelt made less favorable observations and came to less favorable conclusions than previous psychological assessments of Acoli. Nevertheless, Dr. Van Pelt determined that Acoli presented only a low to moderate risk of recidivism -- and never opined that there was a substantial likelihood that Acoli would reoffend. In the end, even Dr. Van Pelt's report does not support the Board's denial of parole. The Board, moreover, may not rely on a single unfavorable psychological report, in disregard of evidence favorable to parole, to reach a preferred outcome. (pp. 49-52)

9. Finally, Acoli's advanced age -- seventy-nine at the time of the hearing (and eighty-five today) -- is another highly relevant factor in determining whether the Board abused its discretion in denying parole. Studies have shown that as individuals age, their propensity to commit crime decreases and, in particular, that elderly individuals released from prison tend to recidivate at extremely low rates. Yet nothing in its decision suggests that the Board considered in any meaningful way the studies on the age-crime curve in denying parole to Acoli. (pp. 52-53)

10. The Parole Board's decision to deny Acoli parole is not supported by substantial evidence in the record or by a reasonable weighing of the relevant factors in N.J.A.C. 10A:71-3.11(b) that govern parole. Even under the most deferential standard of review, the Board has failed to prove by a preponderance of the evidence that there is a substantial likelihood that, if released on parole, Acoli will commit a crime. Acoli must be released because the statutory standards for granting parole have been met, without regard to extraneous factors like sympathy or passion or public opinion. (pp. 53-55)

**REVERSED.**

**JUSTICE SOLOMON, dissenting,** expresses the view that the majority probes the record for evidence favorable to Acoli rather than affording the Parole Board the substantial deference to which it is entitled. Noting that the Board is tasked by the Legislature to make value judgments by assessing the facts in the record and its personal observations of the inmates before it, Justice Solomon explains how the Parole Board formed its decision in this case by reasonably relying on the record as a whole as well as the observations from its members during Acoli's

6

parole hearing. After reviewing the evidence on which the Board relied and noting that removing the Board's ability to evaluate the sincerity of an inmate's presentation would be stripping the Board of one of its core responsibilities, Justice Solomon concludes that the Board came to a well-supported conclusion here. In the dissent's view, the majority diminishes the role of the Parole Board by making the Court the finder of fact, contrary to fundamental principles of appellate review.

**JUSTICE PIERRE-LOUIS and JUDGE FUENTES (temporarily assigned) join in JUSTICE ALBIN's opinion. JUSTICE SOLOMON filed a dissent, in which JUSTICE PATTERSON joins. CHIEF JUSTICE RABNER did not participate.**

SUPREME COURT OF NEW JERSEY

A-73 September Term 2020

083980

Sundiata Acoli, a/k/a
Clark Edward Squire,

Appellant,

v.

New Jersey State Parole Board,

Respondent.

On appeal from the Superior Court,
Appellate Division, whose opinion is reported at
462 N.J. Super. 39 (App. Div. 2019).

| Argued | Decided |
|---|---|
| January 31, 2022 | May 10, 2022 |

Bruce I. Afran argued the cause for appellant (Bruce I. Afran, on the briefs).

Stephanie Cohen, Assistant Attorney General, argued the cause for respondent (Andrew J. Bruck, Acting Attorney General, attorney; Jane C. Schuster, Assistant Attorney General, of counsel and on the brief, and Christopher C. Josephson, Deputy Attorney General, on the brief).

Joseph J. Russo, Deputy Public Defender, argued the cause for amicus curiae Public Defender of New Jersey (Joseph E. Krakora, Public Defender, attorney; Scott M. Welfel, Assistant Deputy Public Defender, of counsel and on the brief, and Joseph J. Russo, on the brief).

1

Alexander Shalom argued the cause for amicus curiae American Civil Liberties Union of New Jersey (American Civil Liberties Union of New Jersey Foundation and Rutgers Law School Constitutional Rights Clinic, attorneys; Alexander Shalom and Jeanne LoCicero, of counsel and on the brief, and Ronald K. Chen, on the brief).

Raymond Brown argued the cause for amicus curiae Association of Criminal Defense Lawyers of New Jersey (Pashman Stein Walder Hayden, attorneys; CJ Griffin, on the brief).

Lawrence S. Lustberg submitted a brief on behalf of amicus curiae American Friends Service Committee (Gibbons, attorneys; Lawrence S. Lustberg and Michael R. Noveck, on the brief).

Richard Lomurro submitted a brief on behalf of amicus curiae National Conference of Black Lawyers (Lomurro, Munson, Comer, Brown & Schottland and Howard University School of Law, Movement Lawyering Clinic, attorneys; Richard Lomurro, of counsel and on the brief, Emeka Nkwuo, of counsel, and Justin Hansford, a member of the Maryland bar, admitted pro hac vice, on the brief).

Jennifer B. Condon submitted a brief on behalf of amicus curiae Center for Constitutional Rights (Seton Hall University School of Law Center for Social Justice, attorneys; Jennifer B. Condon, on the brief).

Andrew Robert Burroughs submitted a brief on behalf of amici curiae the National Association of Blacks in Criminal Justice, the Black Police Experience, Blacks in Law Enforcement of America, and the Grand Council of Guardians (Burroughs Law and Harvard Law School Charles Hamilton Houston Institute for Race and Justice, attorneys; Andrew Robert Burroughs, and Katharine

Naples-Mitchell, a member of the New York and Massachusetts bars, admitted pro hac vice, on the brief).

JUSTICE ALBIN delivered the opinion of the Court.

Sundiata Acoli, now eighty-five years old, has been imprisoned for forty-nine years for his role in the murder of State Trooper Werner Foerster and the wounding of State Trooper James Harper in 1973. He has been a model inmate and infraction-free for more than twenty-five years. During that time, he has consistently received positive institutional reports from the Federal Bureau of Prisons, completed over a hundred programs and counseling sessions, served on the Honor Unit in his institution, taught a course to younger inmates on rational thinking and emotional control, and learned employable skills.

Since 1993, the New Jersey State Parole Board has denied Acoli parole every time he has become eligible for release. On each occasion, including in 2016 when Acoli was seventy-nine years old, the Parole Board determined that there was a substantial likelihood that Acoli would commit a crime if released. The Board, however, has not indicated what crime it fears Acoli might commit at his advanced age.

In 2010, the Parole Board denied Acoli parole, despite psychological assessments that favored his release. The Appellate Division overturned the

3

Board's decision, finding no substantial support in the record to justify Acoli's continued imprisonment. It therefore ordered his release. This Court reversed on procedural grounds to allow the full Board to take firsthand witness testimony before deciding whether to grant parole to Acoli.

At a hearing in 2016, the Parole Board called only one witness, Acoli, who was then suffering from cardiovascular disease and hearing loss. Acoli testified that, if released, he planned to reside with his daughter, a Wall Street risk analyst, and his grandchildren. The State's psychological expert, despite issuing a report less favorable than the previous one, described Acoli's risk of committing another offense as low to moderate. The Board again denied parole, stating "that concerns remain that [Acoli] would commit a crime if released on parole." The Board imposed a fifteen-year future eligibility term. The Appellate Division affirmed.

We now reverse. The Parole Board has not established "by a preponderance of the evidence that there is a substantial likelihood that [Acoli] will commit a crime" if placed on parole. See N.J.S.A. 30:4-123.53 (1979). The Board's decision to deny Acoli parole is not supported by Acoli's well-documented institutional record or by the overall psychological risk assessments. The Parole Board's decision is entitled to deference -- but not blind deference.

The Board clothed its decision with the same findings it has repeatedly invoked to deny Acoli parole -- that he lacked insight into the crime he committed almost a half-century ago and feigned his memory of the events. The parole hearing had little to do with the man who appeared before the Board. Almost no inquiry was made about his exemplary record over the last twenty-five years, his successful completion of programs, his institutional achievements, his fading health, or his prospects in the future. Indeed, the Board's reasons for denying Acoli parole resemble in many ways the contrived reasons we criticized in Trantino v. State Parole Bd. (Trantino VI), 166 N.J. 113, 198 (2001).[1]

No member of the Court disputes that Acoli committed a horrific crime. The issue, however, is whether Acoli, after nearly five decades of imprisonment, has satisfied the statutory demands that govern his parole eligibility. The Parole Board, like every government agency, must faithfully discharge the law entrusted to it, even when it may not be popular to do so. However despised Acoli may be in the eyes of many because of the notoriety of his crime, he too is entitled to the protection of the law -- and to the fair and

---

[1] Our dissenting colleagues make clear that they do not accept this Court's precedent in Trantino VI, repeatedly citing to the dissenting opinion for support instead. Post at ___ (slip op. at 1, 10, 17, 19, 20).

5

impartial administration of justice. That is what our commitment to the rule of law requires.

Many, no doubt, may believe that a person who kills a police officer should never be eligible for parole. Indeed, if such a crime were committed today, the offender would be condemned to serve a term of life in prison without the possibility of parole. N.J.S.A. 2C:11-3(b)(2). At the time that Acoli committed his crime, however, the governing law was different, and he became eligible for parole in 1993. See L. 1948, c. 84 § 11 (amended 1997). Under N.J.S.A. 30:4-123.53 (1979), at the time of Acoli's parole hearing, he was presumptively entitled to release. To overcome that presumption, the Parole Board had the burden of demonstrating that there was a substantial likelihood that, if released, Acoli would commit another crime. Ibid. The Parole Board did not meet that burden. The record does not contain substantial credible evidence to support the Parole Board's decision to deny parole to Acoli. Accordingly, we are compelled to overturn the judgment of the Appellate Division and grant Acoli parole, consistent with his established release plan.

I.

A.

Sundiata Acoli[2] enjoyed a seemingly ordinary upbringing in Texas and conventional young adult life.[3] In 1956, at the age of nineteen, he graduated from Prairie View A&M College, where he majored in math. He began work at the National Aeronautics and Space Administration (NASA) and then was employed by defense contractors. He came of age in the 1950s and 1960s, a turbulent time in race relations in this country. It was a time when African Americans in the South struggled to break the shackles of segregation, to gain admission to public accommodations and transportation, and to secure the right to vote and other constitutional rights. It was a time that gave rise to a civil rights movement, and a time when members of that movement were beaten and arrested, and some killed. Acoli was deeply affected by the injustices and passions of his time. After the brutal murder of three young civil rights workers in Mississippi in 1964, he traveled to the South to assist in voter registration with non-violent civil rights organizations.

---

[2] When convicted, Acoli was known by his legal name, Clark Edward Squire. While imprisoned, he changed his name to Sundiata Acoli.

[3] The statement of facts presented here is based on the record before the Parole Board, including Acoli's testimony at his June 8, 2016 parole board hearing.

During those years, Acoli apparently lost faith in the non-violent path to change. In 1968, the year of Dr. Martin Luther King, Jr.'s assassination, Acoli became a member of the Black Panther Party, an organization that promoted Black nationalism and social welfare programs but also armed self-defense. In 1969, he joined the Black Liberation Army -- a militant group more inclined to commit violent acts in pursuit of its radical goals. As a member of that organization, Acoli moved to Alabama where he engaged in community organizing.

In the early morning hours of May 2, 1973, Acoli was driving a Pontiac LeMans on the New Jersey Turnpike, on his way to Alabama from New York. Travelling with him were two fellow members of the Black Liberation Army, James Costan and Joanne Chesimard (later known as Assata Shakur). All three were armed with handguns. Acoli knew his passengers from their common membership in the organization, but he claimed that he did not know their destination. He was aware, however, that Chesimard was wanted for bank robberies in New York.

Shortly before 1:00 a.m., New Jersey State Trooper James Harper stopped the Pontiac for a broken taillight. Acoli exited his car to speak with Trooper Harper. Almost simultaneously, Trooper Werner Foerster arrived on the scene as backup. Trooper Foerster frisked Acoli while Trooper Harper

8

approached the Pontiac to check the VIN number. While patting Acoli down, Foerster uncovered an ammunition clip in one pocket and then a .380 automatic pistol in another pocket. Trooper Foerster called out to Harper that Acoli was "dirty." According to Acoli, Foerster then struck him on the side of his head with his service firearm.[4]

As Trooper Foerster was confronting Acoli, Trooper Harper stated that Chesimard opened fire at Harper, striking him in the shoulder. A shootout ensued between Harper, Chesimard, and Costan. During the exchange of fire, Chesimard and Costan were wounded. In the meantime, Acoli attempted to wrest Trooper Foerster's gun from him. In the course of that physical struggle, Acoli claims that Trooper Harper fired at him, grazing the top of his head and causing him to black out. In the midst of the melee, Harper ran toward the State Police Barracks located 200 yards away for help.

According to Acoli, when he regained consciousness, the gravely injured Costan was leaning on Harper's troop car, telling Acoli to get up. Trooper Foerster's body was lying on the ground nearby. Acoli assisted Costan to the Pontiac, where he found Chesimard severely wounded. Acoli drove the Pontiac about five miles, pulled it onto the shoulder of the road, and assisted

---

[4] The Parole Board did not credit that account because photographs taken at the time of Acoli's arrest did not reveal injuries to his face.

Costan and Chesimard out of the vehicle. As the police arrived, Acoli fled into the woods. The wounded Chesimard remained behind and surrendered. By that time, Costan had died from his injuries, and the police found Foerster's service revolver under his body. The next day, Acoli was apprehended.

When state troopers arrived at the scene of the initial motor vehicle stop, they found Trooper Foerster's body lying on the roadway. Trooper Foerster had been shot four times, twice in the head with his own revolver and twice by bullets fired from Acoli's gun. Who fired the fatal shots that killed Trooper Foerster remains a disputed issue. The Middlesex County Prosecutor, in a letter to the Parole Board, stated either Acoli <u>or</u> Chesimard could have fired the shots from Foerster's weapon.

In 1973, Acoli and Chesimard were indicted on charges related to the murder of Trooper Foerster and the shooting of Trooper Harper. Acoli and Chesimard were tried separately. A jury found Acoli guilty in 1974 of all charges, including murder, assault with intent to kill Harper, and illegal possession of a weapon.[5] Acoli was sentenced to a term of life imprisonment for committing murder and to consecutive prison terms of ten to twelve years for assault with intent to kill; two to three years for illegal possession of a

---

[5] Chesimard was also convicted of murdering Foerster and charges relating to the shooting of Harper.

10

weapon; and twelve to fifteen years for armed robbery. In total, he received an aggregate prison sentence of life plus twenty-four to thirty years.[6]

Under the law that controlled the crimes he committed in 1973, Acoli first became eligible for parole in 1993. N.J.S.A. 30:4-123.11 (repealed 1997). The Parole Board has denied Acoli parole every time he became eligible for release.

B.

1.

Acoli has lived the last forty-nine years in various federal prisons. He initially struggled to adapt to a life of incarceration. His involvement in a 1979 escape attempt resulted in another conviction for which he received a concurrent term of five years in 1982. Eventually, Acoli came to terms with his new life and made the best of it. In the fifteen years between 1979 and 1994, Acoli had no institutional infractions. He received five minor infractions between 1994 and 1996, all of which resulted only in loss of commissary or visiting privileges, or extra hours of duty.

---

[6] Before the Turnpike shooting, Acoli had been convicted of disorderly conduct and possession of marijuana in 1965, and possession of a weapon and possession of marijuana in 1966, for which he was placed on probation.

Acoli's record over more than a quarter century has been exemplary. The Federal Bureau of Prisons has kept detailed records of Acoli's institutional progress, including his completion of 120 prison programs.[7]

A 1998 progress report from the federal penitentiary at Allenwood recorded that Acoli had developed "positive avenues to channel his energy." Acoli had become active in "peer organizations" and had participated in such programs as Criminal Thinking, Anger Management, and Self Discovery. In those programs, group counselors described Acoli as "an excellent participant." Acoli completed a computer course with a 4.0 grade average for which he received a certificate of excellence. He also graduated with honors from a two-year paralegal course and a real estate course and, additionally, held the position of Public Relations Officer in the African Culture Group.

That same year, Dr. Richard G. Dudley, Jr., a prison psychologist, expressed in a report that if Acoli were to be granted parole, "he evidences the

---

[7] See, e.g., Critical Thinking I, II; Know Thyself (taken twice); Doing Time With the Right Mind; Drug Relapse Workshop; Everyday Life I, II; Families Doing Time, I, II; Creative Writing I, II; Civil Rights I, II, III; Africans in America; Creative Writing; Basketball Officials Course; African Culture (taken multiple times); Inmate Instructed Self-Improvement; ACE Course in Black History; Ind. Study for Job Prep; ACE Video Instructed Art Class; Adult Basic Education.

psychological stability required to successfully adjust to life outside of prison."

A 2003 Allenwood report positively noted that Acoli was "a member of the institution's Honor Unit program" and a "prisoner representative" in an organization that "establishe[d] programs and activities for the inmate population." Acoli consistently received "above average work evaluations." A 2007 Allenwood report stated that Acoli performed "above-average in the areas of quality of work, quantity of work, initiative, interest, ability to learn, need for supervision, response to supervision and ability to work with others."

A 2009 progress report from the Otisville Federal Correctional Institute recorded that Acoli "has participated in programs as recommended" and "displayed a positive rapport with both staff and inmates." The Psychology Services staff positively noted that Acoli had developed "adequate coping skills, an organized approach to completing goals and [an] ability to establish positive interaction with others." The staff also expected that Acoli would "be able to transition to the community if paroled."

In 2009, the Bureau of Prisons presented Acoli with a lifetime achievement award from his peers. The Certificate of Recognition stated: "You have consistently bridged the gap and promoted unity, education and peace amongst prisoners from around the world in the Federal Bureau of

13

Prisons.  You have demonstrated year after year your love for Humanity and Redemption."

In 2014, within the federal prison system, Acoli began instructing a course in Critical Thinking -- a course in which he "provid[ed] guidance to the younger inmate population and [taught] them to act out of rationality."  He has not had a single infraction in twenty-five years.

2.

Acoli became eligible for parole for the third time in 2010.  Before his 2010 parole hearing, the State assigned Dr. Lois D. Goorwitz, a licensed psychologist, to assess Acoli's institutional progress.  Dr. Goorwitz determined that Acoli's institutional adjustment was "above average" and that he displayed "adequate insight."  In interviewing Acoli, Dr. Goorwitz observed that he was "very cooperative, self[-]reflective, thoughtful, and non[-]defensive."  He also "appeared to be answering [questions] honestly."  In her report, Dr. Goorwitz referred to the multitude of programs completed by Acoli, including therapeutic programs.  She noted that Acoli's computer instructor described him as "an excellent student."

In Dr. Goorwitz's view, Acoli appeared remorseful, pointing to Acoli's expression of deep regret for his "part in Trooper Fo[er]ster's death."[8] Acoli had told her that "the years he has participated in individual as well as group counseling has led him to see life differently," and that he "no longer believes in the use of violence for political purposes." He pointed to the election of President Barack Obama as proof that "[t]here are other ways to accomplish change."

Dr. Goorwitz found "NO psychological contraindications to granting parole." She pointed out Acoli's "[g]ood family support" as well as his [e]xpressed family values" and "motivation to make changes in lifestyle and behavior." She assessed his risk of recidivism as "moderate," only twenty-eight percent. Dr. Goorwitz emphasized that Acoli's "mental health treatment" and the maturity he gained through the years had resulted not only "in significant self[-]growth," but also in his "ability to take responsibility for his crimes." She also stressed that he had "significantly changed views on politics and the use of violence." She concluded that "it is time to seriously consider [Acoli] for parole."

_____

[8] Dr. Goorwitz expressed "some concern" that Acoli could not identify who shot Trooper Foerster and acknowledged that he had a number of disciplinary charges before 1996.

15

A two-member panel of the Parole Board conducted a hearing at which Acoli testified. Acoli provided the same account of the Turnpike incident that he has consistently given over the years. He repeated that he did not know who shot Trooper Foerster but told the Board that he accepts responsibility for the Trooper's death.

In recommending the denial of parole, the panel gave little weight to Acoli's positive institutional record and largely disregarded Dr. Goorwitz's favorable report. The panel found that Acoli "continue[s] to remain a substantial threat to public safety" because of his inability "to identify or adequately address the causes of his criminal behavior" or "to demonstrate remorse and empathy." According to the panel, Acoli continued to "minimize [his] maladaptive behavior," and "to deny key aspects of the offenses." Acoli appealed to the full Parole Board, which, in part, relied on the interview conducted by the two-member panel in affirming the denial of parole.

Acoli appealed the Parole Board's decision.

2.

In September 2014, the Appellate Division held that the Parole Board had failed to establish that there was a substantial likelihood that Acoli would

reoffend if released. The Appellate Division determined that the Parole Board's findings that Acoli lacked insight, did not accept responsibility, and could not explain how his violent thinking had changed were unsupported by the record. In addition, in the court's view, the Board paid too little regard to Dr. Goorwitz's favorable psychological report and gave too much weight to its assessment that Acoli was likely to recidivate based almost solely on the crimes he committed four decades earlier.

The court also explained that Acoli's "forty-year-old recollection of the events is not likely to change" and "should not stand in the way of [his] parole." It noted that Acoli's version of events -- albeit different from the State's -- had remained consistent over the years. The Appellate Division concluded that the Board's findings were "so wide of the mark and so fundamentally contradicted by the record" that the Board's decision warranted reversal, quoting Kosmin v. State Parole Bd., 363 N.J. Super. 28, 43 (App. Div. 2003). The Appellate Division thus ordered that Acoli be placed on parole.

<div align="center">3.</div>

We granted the Parole Board's petition for certification, Acoli v. State Parole Bd., 221 N.J. 220 (2015), and reversed on procedural grounds, Acoli v. State Parole Bd., 224 N.J. 213, 232 (2016). The Court held that N.J.S.A. 30:4-

<div align="center">17</div>

123.55(f) required a full Parole Board hearing with witness testimony before Acoli could be released. Id. at 231. The Court remanded to the full Parole Board for a hearing, leaving open the possibility of a further appeal to the Appellate Division. Id. at 232.[9]

## II.

## A.

In the six years between the 2010 and 2016 hearings, Acoli remained infraction-free, continued to receive positive reports from prison staff, and completed twenty-four more programs. In advance of the 2016 parole hearing, the Board retained the services of a new licensed psychologist, Dr. Julia Van Pelt. Although Acoli's institutional record was exemplary during the six-year interim, Dr. Van Pelt arrived at completely different conclusions from those reached by Dr. Goorwitz. The same exact responses that Dr. Goorwitz credited as sincere six years earlier, Dr. Van Pelt rejected as inauthentic. After listening to Acoli's account of what occurred in 1973, Dr. Van Pelt opined that Acoli failed to take responsibility for his actions. She did not accept as genuine Acoli's expressions of remorse and his verbal renunciation of violence as a vehicle for social change. In Dr. Van Pelt's view, Acoli had an "inability

---

[9] Justice Albin dissented, stating that he would have affirmed substantially for the reasons articulated by the Appellate Division. Id. at 240.

18

. . . to at least superficially condemn violence" and appears to "at least passively condone aggression."

Dr. Van Pelt acknowledged that Acoli's peers viewed Acoli as a "wise elder." She also reported that his case manager indicated that, if there were ever to be trouble in the unit, Acoli would merely be considered "an old man in the way." Dr. Van Pelt assessed Acoli as presenting a low to moderate risk of recidivism. She did not render an opinion that there was a substantial likelihood that Acoli would reoffend if released. Instead, she found that Acoli would struggle to abide by the restrictions of parole, "[e]specially now, with increased tensions in the larger community about police's use of force and racial discrimination . . . [which] may create an atmosphere particularly conducive for his . . . sense of social responsibility."

<div align="center">B.</div>

On June 8, 2016, the full Board conducted a hearing, calling only one witness -- Acoli. During approximately six hours of questioning, the then-seventy-nine-year-old Acoli spoke about his failing health, including his cardiac disease, difficulty hearing, and memory loss.

Most of the questioning probed Acoli's recall of the 1973 Turnpike shooting. Consistent with the account he had given at prior parole hearings, Acoli stated that once the gun battle broke out between Trooper Harper,

<div align="center">19</div>

Costan, and Chesimard, he struggled with Trooper Foerster, then blacked out when a bullet grazed the top of his head. The Board repeatedly asked Acoli who shot Trooper Foerster, and, every time, Acoli responded that he did not know.

Toward the end of six hours of examination, the Board demanded that Acoli go beyond what he remembered and conjecture about how Trooper Foerster was killed. Acoli was asked, "Who do you think killed Trooper Foerster?" (emphasis added). To that speculative question, Acoli answered, "I think [Trooper Foerster] was probably shot by Trooper Harper" while he struggled with Foerster. Acoli's errant speculation elicited by the Board provided the basis for the Board's later claim that Acoli had changed his account of the shooting.

The Board asked Acoli few questions about his decades-long infraction-free and model institutional record or about the dozens of programs he had completed (other than one, Criminal Thinking). The Board took little interest in his achievements and rehabilitative steps, the positive reports filed by the Federal Bureaus of Prisons, or the plans he had if paroled. Some Board members expressed fascination with the Superfly hat he wore in the 1970s. Other members expressed puzzlement over why Acoli, who had "the[] advantages" of a good family, a college education, and secure employment,

20

became focused on the plight of less fortunate African Americans and their civil rights. He simply explained that he wanted all Black people to "gain an equal opportunity to a better life." That motivation led him to join a radical organization -- even one willing to use violence. The Board expressed concern about whether Acoli had disavowed violence as a legitimate means of achieving political or social change.

Acoli stated that he was "older, and hopefully wiser" and had come to realize, through counseling and over time, that change in society could "be attained through nonviolent means." As an example of such change, he pointed to the election of President Barack Obama. He told the Board that he did not "advocate and condone violence, and particularly in bringing about . . . political change" and that he "fully embrace[d] living a peaceful lifestyle."

At the end of the hearing, Acoli conveyed his deep regret for his role in the murder of Trooper Foerster and his "deepest remorse, and sincere apology to Trooper Foerster's family." He added, "No one can change the past, but anyone can pay the penalty to change themselves. And that's what I've been working on these many years." He reflected that he was now "an old man" whose "memory fails me more and more each day[.] . . . But I do know that I deeply regret the actions that transpired, those were turbulent and fearful

21

times." Acoli stated that if paroled, he would live with his daughter and grandchildren in their home.

After the hearing concluded, the Board denied Acoli parole.

C.

On December 22, 2016, the Parole Board issued a six-page opinion explaining its decision to deny parole. The Board stated that, "based upon answers [Acoli] provided at the hearing, . . . concerns remain that [he] would commit a crime if released on parole." The Board faulted Acoli because "[his] answers were not spontaneous and [he] paused before answering each question"; because his answers "lacked depth and revealed that [he] d[id] not have an adequate understanding of [his] criminal thinking"; because "[his] presentation was shallow and emotionless"; because "[his] responses were superficial in nature and appeared rehearsed"; and because he had "chosen to speculate [about] who fired the fatal shots" and "could not reconcile [his] conjecture with the evidence from the crimes." (emphasis added). The Board stressed that Acoli had "made negligible progress into understanding why [he] chose to be part of a violent militant organization." Although the "Board noted the numerous programs that [Acoli had] completed during [his] incarceration," it nevertheless found that Acoli could not "articulate any

22

cognitive thoughts that would indicate [his] understanding of seeking resolution to an issue without resorting to criminal activity."

Consequently, the Board determined that "after 42 years of incarceration . . . [m]ore work needs to be done on [Acoli's] part to undergo a meaningful introspection into the internal and external factors that impelled [his] life choices." The Board imposed a fifteen-year future eligibility term, retroactive to July 17, 2010.[10]

On June 21, 2017, the Parole Board denied Acoli's administrative appeal, with some more detail but mostly for the reasons stated in its earlier decision.

## D.

A divided three-judge panel of the Appellate Division affirmed the decision of the Parole Board, with Judge Rothstadt dissenting. Acoli v. State Parole Bd., 462 N.J. Super. 39 (App. Div. 2019).

The panel majority emphasized the deferential standard of review afforded to a decision of the Parole Board and the expertise the Board brings to bear on the "highly predictive and individualized discretionary appraisals" in prognosticating "an inmate's future behavior." Id. at 51 (quoting Acoli, 224

---

[10] The Board indicated that, based on Acoli's pattern of earning work and commutation credits, it projected his next parole eligibility date "to be in March 2019."

N.J. at 222). To explain the contrast between its decision to affirm the Board's denial of parole and the Appellate Division panel's 2014 decision ordering Acoli's release, the panel majority focused on the purported differences in the records presented to the two panels.

First, the panel majority noted that the Board's "new psychologist" had interviewed Acoli and reviewed "approximately twenty-one documents" and came to a considerably less favorable view of Acoli than the one expressed in the 2010 psychological report issued to the Board. Id. at 64-65. The panel majority found "nothing perfunctory about the new report." Id. at 64.

Second, the panel majority pointed out that, in this round, Acoli appeared before the full Board, which found "that his responses were insincere, rehearsed, shallow, and emotionless" and that "he gave contradictory and implausible responses, especially about blacking out." Id. at 65.

Third, the panel majority stressed that "[t]his record -- not the earlier one -- supports the difficulty the Board had believing Acoli blacked out." Ibid. Throughout its opinion, the panel majority highlighted that Acoli "testified that Trooper Harper 'probably shot' Foerster in friendly fire, and specifically denied that his two passengers could have done so." Ibid. The panel majority barely mentioned, however, that Acoli's response came after he repeatedly

24

stated he had no recall of the events and only after the Board urged him to speculate about what he thought might have occurred.

Finally, the panel majority acknowledged that Acoli participated in 100 different self-improvement programs, in addition to vocational training. But it apparently gave great weight to the fact that when Acoli was asked open-ended questions about one course he had taken, Criminal Thinking, at some undefined period in the past, all that he recalled was that it had "something to do with not breaking the law." Id. at 66.

The panel majority concluded that "there is ample support in the record for the Board's determination that there is a substantial likelihood that Acoli will commit another crime . . . if the Board grants him parole." Ibid.

In his dissent, Judge Rothstadt stated that, despite the majority's claim that "new information justified the Parole Board's actions, . . . the record . . . has remained virtually unchanged since [the Appellate Division] last visited this matter in 2014."[11] Id. at 67. Judge Rothstadt described the proceedings before the Parole Board as a "show hearing" that arrived at a "desired" result, and he lamented that the panel majority's affirmance of the Board "abandons our guiding principles" and "contravenes the public policy behind the Parole

---

[11] Judge Rothstadt was a member of the three-judge panel that reversed the Parole Board's decision to deny Acoli parole in 2014.

25

Act of 1979."  Id. at 67-68, 77.

Judge Rothstadt made clear that despite the senseless crime committed by Acoli, the Parole Board and the panel majority did not faithfully apply the Parole Act, which "effectively establishes a presumption in favor of parole." Id. at 71 (quoting In re Parole Application of Trantino (Trantino II), 89 N.J. 347, 355-56 (1982)).  According to Judge Rothstadt, the Parole Board did not meet its burden of proving that Acoli "should not be released."  Ibid. (quoting State Parole Bd. v. Byrne, 93 N.J. 192, 205 (1983)).  He reasoned that "if model prisoners, like Acoli, perceive that parole decisions are not based upon an inmate's development and rehabilitation," inmates will be left without incentives or hope, and will lose faith in our system of justice.  Id. at 71, 77. He concluded that the Parole Board unjustifiably overlooked and undervalued critical evidence that warranted the granting of parole.  Id. at 77.

This case comes before this Court as an appeal as of right based on Judge Rothstadt's dissent.  See R. 2:2-1(a).

III.

A.

Acoli contends that the Board failed to meet its burden of showing that there is a substantial likelihood he will commit a crime if released on parole. He states that, in violation of the directives of Trantino VI, the Board

26

relentlessly focused on the circumstances of the offense he committed nearly a half-century ago -- and his memory of those events -- almost to the exclusion of all else, including a plethora of favorable evidence that he is an appropriate candidate for parole. (citing 166 N.J. at 175-95). Acoli also claims that, in contravention of <u>Trantino</u>, the Board arbitrarily cherry-picked evidence -- mostly about his alleged feigned memory and refusal to admit to shooting Trooper Foerster -- to reach a desired result and undervalued all the positive evidence. Acoli cites, as proof of his rehabilitation and commitment to live a non-violent life, his infraction-free record during his last twenty-five years of incarceration, his 2010 psychological report favoring parole, his extensive participation in educational and counseling programs, and the positive testimonials from the Federal Bureau of Prisons, which praised his coping skills, psychological progress, and positive rapport with others.

He argues that the Board raised speculative concerns that in the free world he may come upon "similarly charged situations regarding social injustice and community activism" like those in the 1960s and 1970s but failed to specify how those concerns equate to a substantial likelihood that he will reoffend in 2022. The vague fear that he will join some violent radical movement at the age of eighty-five, Acoli asserts, is not borne out by any fact-based risk assessment.

27

Indeed, Acoli submits that his advanced age and declining health weigh heavily in favor of granting parole, as studies indicate elderly individuals are highly unlikely to re-offend upon release. He asks this Court to reverse the Appellate Division and order his release because he was denied parole based on a mere "possibility" of future criminal behavior, not based on a "substantial likelihood" that he would reoffend, as required by law.

B.

The Board urges this Court to apply "the narrow and deferential review" afforded to administrative agency determinations and affirm the denial of parole to Acoli. Such deference is warranted, it contends, because the Board has specialized expertise in making "highly predictive and individualized discretionary appraisals" that are "inherently imprecise," quoting Acoli, 224 N.J. at 222. The Board emphasizes that it had the opportunity to hear and assess the credibility of Acoli's testimony, which it found was "insincere, rehearsed, shallow and emotionless," quoting Acoli, 462 N.J. Super. at 65. It also stresses that, at the hearing, Acoli showed that he "lacked criminal insight into his criminal behavior," "minimized his conduct," and failed to demonstrate an "understanding how his criminal thinking pattern has changed."

The Board expresses that it was "particularly troubled" by Acoli's decision to speculate that Foerster was killed by "friendly fire" and thus to deviate from his previous statements that he "blacked out" after being grazed by a bullet fired by Trooper Harper. Given "Acoli's previous participation in a 'radical organization,'" the Board also states its concern about Acoli's potential "community activism," if released, and about whether he had the "tools" to deal with "charged situations regarding social injustice" similar to those in the 1960s and 1970s. It contends that Acoli has failed "to show how his criminal thinking pattern has changed since the murder of Trooper Foerster."

The Board asserts that, despite "the significant mitigating evidence in the record," including Acoli's advanced age, medical history, and "record of rehabilitative program participation," that evidence was outweighed by the aggravating factors, particularly his "insufficient problem resolution." In rendering its decision, the Board argues that it "considered all relevant material facts," consistent with N.J.A.C. 10A:71-3.11(b). In sum, the Board states that there was a substantial likelihood that Acoli would reoffend if paroled based on "the entire administrative paper record, the new psychological evaluation, and importantly, Acoli's own responses" at his parole hearing.

29

## C.

We granted the motions of a number of organizations to participate as amici curiae: the American Civil Liberties Union; the Office of the Public Defender; the Association of Criminal Defense Lawyers; the American Friends Services Committee; the Center for Constitutional Rights; The National Association of Blacks in Criminal Justice, the Black Police Experience, Blacks in Law Enforcement of America, and the Grand Council of Guardians; and the National Conference of Black Lawyers. Those organizations urge this Court to overturn the Appellate Division majority's affirmance of the Parole Board's denial of parole.

## IV.

## A.

The Parole Board is charged with the statutory responsibility of determining, by a preponderance of the evidence, whether there is a substantial likelihood that Acoli -- now eighty-five years old -- will commit a crime if released on parole. See N.J.S.A. 30:4-123.53 (1979). In making that "highly 'individualized'" appraisal, which is necessarily predictive of future behavior, the Legislature has conferred on the Parole Board broad power. Trantino VI, 166 N.J. at 173 (quoting Beckworth v. State Parole Bd., 62 N.J. 348, 359 (1973)). Parole determinations therefore are entitled to deferential review by

our courts. Ibid. A mere difference of opinion is not a basis for a court to overturn a parole decision. Cf. Campbell v. N.J. Racing Comm'n, 169 N.J. 579, 587-88 (2001).

The discretionary power exercised by the Parole Board, however, is not unlimited or absolute. Trantino VI, 166 N.J. at 173. A government agency, such as the Parole Board, may not wield its discretionary power arbitrarily. See In re Parole Application of Hawley, 98 N.J. 108, 112 (1984). Like all agency decisions, those rendered by the Parole Board are subject to judicial review. However deferential the standard of review may be, our courts are the ultimate arbiters of whether the Board has acted within the bounds of the law. Id. at 112-13.

Although courts are cautioned not to substitute their judgments for that of the Parole Board, when a parole decision is so far wide of the mark or so manifestly mistaken under the governing statutory standard, intervention is required in the interests of justice. Trantino VI, 166 N.J. at 192. A Parole Board decision that either violates legislative policy, is not supported by "substantial evidence" in the record, or "could not reasonably have been made on a showing of the relevant factors" cannot be sustained. Trantino v. State Parole Bd. (Trantino IV), 154 N.J. 19, 24-25 (1998).

31

B.

The Parole Act of 1979 provides that an inmate, such as Acoli, "shall be released on parole at the time of parole eligibility, unless [it is shown] by a preponderance of the evidence that there is a substantial likelihood that the inmate will commit a crime . . . if released on parole at such time." Trantino VI, 166 N.J. at 126 (alteration and omission in original) (emphasis added) (quoting N.J.S.A. 30:4-123.53 (1979)).[12]  "Likelihood" is defined as a "probability," or "the appearance of probable success," and "substantial" is defined as "considerable in amount" or "being that specified to a large degree."  Webster's Third International Dictionary 1310, 2280 (1981). Requiring that the Board show that there is a substantial "probability" that an inmate will reoffend is a fairly high predictive bar that must be vaulted -- even though such an assessment will defy scientific rigor and involves a certain degree of subjectivity.

This much we can say about the term "substantial likelihood." Assessing the risk that a parole-eligible candidate will reoffend requires a

_____

[12]  We apply the statute governing parole at the time of Acoli's conviction. See N.J.S.A. 30:4-123.53 (1979).  Today, the Parole Board may deny parole if it is shown by a preponderance of the evidence that an "inmate has failed to cooperate in his or her own rehabilitation or that there is a reasonable expectation that the inmate will violate conditions of parole imposed pursuant to [N.J.S.A. 30:4-123.59]."  See N.J.S.A. 30:4-123.53.

32

finding that is more than a mere probability and considerably less than a certainty. To be sure, the mere "potential" that an inmate if released may reoffend is not sufficient. See State Parole Bd. v. Cestari, 224 N.J. Super. 534, 550 (1988). Only when the risk of reoffending rises to "a substantial likelihood" may a parole-eligible inmate be denied parole. Ibid.

The 1979 Parole Act altered the prior parole scheme and "shift[ed] the burden to the State to prove that the prisoner is a recidivist and should not be released." Byrne, 93 N.J. at 205. The change in the parole law corresponded with the passage of the new Code of Criminal Justice, L. 1978, c. 95 (codified at Title 2C of the New Jersey Statutes), which provided for "more definite and severe sentences," Byrne, 93 N.J. at 205. "Inmates serving sentences under the Code . . . have presumptively satisfied all punitive aspects of their sentences at the time they become eligible for parole." Id. at 205 n.6 (quoting Trantino II, 89 N.J. at 370). The language of the 1979 Parole Act "creates a protected expectation of parole in inmates who are eligible for parole." Id. at 206. Ultimately, the objective of the Act was "to reduce the discretionary authority of the Board." Cestari, 224 N.J. Super. at 548 n.6.

Under the 1979 Parole Act, the Parole Board must assess a number of factors for the purpose of determining "what a man is and what he may become rather than simply what he has done." See Acoli, 224 N.J. at 222

33

(quoting <u>Greenholtz v. Inmates of Neb. Penal & Corr. Complex</u>, 442 U.S. 1, 10 (1979)).  N.J.A.C. 10A:71-3.11(a) provides that the grant or denial of parole must "be based on the aggregate of all pertinent factors."  That regulation sets forth a list of twenty-four factors that the Parole Board "shall consider," in addition to other factors it may deem relevant, in making a parole decision. N.J.A.C. 10A:71-3.11(b).

Some of those factors include:  facts and circumstances related to the underlying crime; offenses and disciplinary infractions committed while incarcerated; participation in institutional programs and academic or vocational education programs; documentation reflecting personal goals, personal strengths or motivation for law-abiding behavior; mental and emotional health; parole plans; availability of community resources or support services; statements by the inmate reflecting on the likelihood that he will commit another crime; the failure to rehabilitate; history of employment and education; and statement or testimony of any victim.  <u>Ibid.</u>

The weight to be assigned to any one factor will depend on the unique history, background, and characteristics of the individual and the institutional record developed during years of incarceration.  Some factors may have high value and others lower value.  For example, although the "[f]acts and circumstances of the offense" is one factor, N.J.A.C. 10A:71-3.11(b)(5), "the

gravity of the crime" cannot serve as "an independent reason for continuing punishment and denying parole" under the 1979 Act, Trantino II, 89 N.J. at 373-74. That is because the punitive aspects of the sentence have been satisfied by the time an inmate is eligible for parole. Id. at 370.

The failure of an inmate "to cooperate in his or her own rehabilitation" is another factor. N.J.A.C. 10A:71-3.11(b)(9). An inmate's progress or lack of progress toward rehabilitation is relevant only to the extent it bears on whether there is a substantial likelihood that he will reoffend if released. See Trantino IV, 154 N.J. at 31. In assessing the weight to be given to this factor, an inmate's "prison record plainly is material" -- including any institutional infractions, the appraisals of work supervisors, participation in individual and group psychotherapy, and the completion of educational and rehabilitative programs. Id. at 32.

In Trantino VI, this Court set guideposts that are directly relevant to our review of the Parole Board's decision in this case. 166 N.J. at 175-90.

<div align="center">C.</div>

In Trantino VI, this Court reversed the Parole Board's decision to deny parole to Thomas Trantino, who was convicted of murdering two police officers in 1963. 166 N.J. at 121-23. Trantino's death sentence for those crimes was later commuted to life imprisonment. Id. at 124-25. Trantino was

<div align="center">35</div>

denied parole by the Board more than five times over the span of twenty years. Id. at 122, 126-41. After Trantino had served thirty-seven years in prison, and was in his sixties, this Court ordered his release on parole because the Parole Board had failed to show that there was a substantial likelihood that he would commit another crime. Id. at 197.

The Court found that the Board had thwarted Trantino's release by not abiding by the statutory standard governing parole. Id. at 192. The Court acknowledged the depraved crimes committed by Trantino and the public outrage prompted by his eligibility for parole. Id. at 196-97. This Court cautioned, however, that government agencies may not "create exceptions to the rule of law" by "exempting the disfavored." Id. at 198.

This Court rejected the Board's characterization that Trantino's failure to recall the specific details of the murders evidenced a "pattern of deception." Id. at 177. The Court referred to its earlier decision in Trantino IV, where it determined that "there is evidence in the record that Trantino's memory loss is consistent, long-standing and genuine" and that "the record supports the finding that Trantino cannot and will not ever be able to remember actually pulling the trigger." Id. at 177-78 (quoting Trantino IV, 154 N.J. at 35, 38). This Court also rejected the Board's conclusion that Trantino could "never be paroled until he sufficiently recall[ed] the details" of his crimes. Id. at 177.

The Court determined that Trantino's inability to recall the specifics of the crime was not necessary to ensure Trantino would not reoffend upon release. Id. at 178.

The Court also found the Board's "highly selective focus only on the psychological evidence supportive of its denial of parole, and its total disregard of evidence favorable to parole, undermine[d] the deference" to which it was normally entitled. Id. at 188. Specifically, the Board relied heavily on the testimony of a single expert, who opined that Trantino had borderline personality disorder which made him "a particularly dangerous individual." Id. at 185. The Court "note[d] that of the fifty-plus psychological evaluations" included in the record, that psychologist was the only one to diagnose Trantino with that condition. Id. at 185-86. The Court held that the Board "effectively disregarded" the multiple other psychological evaluations in the record supporting parole. Id. at 188.

Finally, and more globally, the Court concluded that parole had been denied based "on the Board's selective and arbitrary reliance on only those portions of the record that could possibly support the Board's conclusion." Id. at 189. The Court noted that the Board failed to adequately address "substantial evidence in the record, spanning many years of infraction-free incarceration and favorable psychological evaluations, that demonstrated

Trantino's likelihood of success on parole." Ibid. (citing State in Interest of C.A.H. & B.A.R., 89 N.J. 326, 344 n.5 (1982)). "Because of the Parole Board's unjustifiable and 'obvious overlooking or undervaluation of crucial evidence,'" the Court held that its determination was "manifestly mistaken and must be set aside." Id. at 192 (quoting State v. Johnson, 42 N.J. 146, 162 (1964)).

Recognizing that the grant of parole in any given case may be highly unpopular, this Court emphasized that "public outrage . . . has no place in a parole proceeding and is to be given no weight in a parole decision." Id. at 127 (quoting Trantino II, 89 N.J. at 376).

The parallels between the Parole Board's approach to the Trantino and Acoli cases are striking. With the principles of Trantino VI as our guide, we now address the validity of the Parole Board's decision to deny Acoli parole.

V.

A.

To a great extent, the Parole Board has declined to follow this Court's directives in Trantino VI. Although the crime Acoli committed occurred forty-nine years ago, the Board's hyper-focus on Acoli's recollection of the events and its inherent finding that his account lacked credibility became one of its critical justifications for denying parole. The Board also refused to credit the

38

sincerity of Acoli's repeated assertions that he has renounced violence as a legitimate means to accomplish social change and his regret for his involvement in the killing of Trooper Foerster and wounding of Trooper Harper. Instead, the Board has taken refuge in threadbare findings that Acoli lacks insight into the conduct that led him to his involvement in the crimes he committed in 1973 and that he still refuses to take responsibility for his acts.

In addition, the Board overvalued the sole unfavorable psychological report and completely disregarded the positive psychological assessments. It also gave little weight to Acoli's exemplary institutional record and model-inmate status over twenty-five years. Last, the Board gave no consideration to the age-crime curve -- that as an inmate approaches the later stages of life, the likelihood of his committing a crime greatly diminishes. Acoli stands before the Court at the age of eighty-five, in compromised health, and with a parole release plan to live with his daughter and grandchildren.

Ultimately, we conclude that the Board's finding that there is a substantial likelihood that Acoli will commit a crime if paroled is not supported by substantial credible evidence in the record. See id. at 122.

We now detail the failings of the Board in coming to its parole determination in this case.

B.

1.

During Acoli's parole hearing, the Board questioned Acoli for more than six hours. Acoli fielded hundreds of questions, most of which required him to repeat again and again his recollection of the motor vehicle stop and the frenzied events that followed in the early morning of May 2, 1973. Acoli stated, as he had on other occasions, that Trooper Harper shot at him and a bullet grazed his head, causing him to lose consciousness; and that when he awakened, he found Trooper Foerster lying on the ground dead.[13]

---

[13] The forensic evidence, which Acoli has not challenged, established that Trooper Foerster was shot in the head twice with his own weapon. Nothing in the record tells us the precise theory relied on by the jury in finding Acoli guilty of murder. The Middlesex County Prosecutor's Office acknowledged that the forensic evidence did not prove who shot Trooper Foerster. The Middlesex County Prosecutor forwarded a letter to the Board that indicated that its office could not rule out that one of Acoli's passengers had fired the fatal shots. Indeed, according to the lead investigator for the State Police, in a recent interview, "it was Chesimard who killed Foerster as blood with the slain trooper's blood type was found on her socks from when she stood over him. 'She straddled him and fired.'" Kevin Shea, He investigated N.J. trooper's infamous murder 49 years ago and doesn't want gunman to get parole, N.J.com (Feb. 05, 2022) (quoting James Challender, lead investigator in the case), https://www.nj.com/politics/2022/02/he-investigated-nj-troopers-infamous-murder-48-years-ago-and-doesnt-want-gunman-to-get-parole.html. That being said, whether he fired the fatal shots or not, Acoli is guilty of the murder of Trooper Foerster for his role in committing the crime.

Board members asked Acoli no less than a dozen times: Who killed Trooper Foerster? Each time, Acoli responded that he did not know because he had blacked out. Nearing the six-hour mark of questioning, after Board members had exhausted the realm of Acoli's recollection -- what he actually knew -- Acoli was asked to speculate.

One Board member queried, "[W]ho do you <u>think</u> killed Trooper Foerster?" Acoli replied, "I don't <u>know</u>." The Board member pressed, "I didn't ask you to <u>know</u>. I asked you who do you <u>think</u>." (emphases added). In a typical court proceeding, a question demanding that a witness conjecture would not be permissible. But this was a parole hearing, and Acoli had no choice but to respond. Acoli answered, "I <u>think</u> Harper probably shot him under friendly fire." (emphasis added).

The confused conjecture surely did not match the ballistic evidence. But the Parole Board erroneously stated that Acoli had "<u>chosen</u> to speculate who fired the fatal shots." Indeed, the Board demanded that Acoli speculate and then chided him for doing so: "[Y]ou have never before speculated as to who you believed shot and killed the trooper"; "you chose to deviate from your past statements and speculated that the trooper was killed by friendly fire"; and "it is disturbing that you would make such conjecture."

41

The Parole Board made no distinction between the consistent accounts that Acoli had given based on his recollection and the speculation that the Board demanded. Acoli did not change his story, as the Board asserts, and as the Appellate Division majority mistakenly maintained. Instead, he acceded to the Board's urging that he speculate. The changed-story canard became a seemingly pivotal basis for denying Acoli parole.

Even if Acoli's recollection had faltered after six hours of questioning about events that occurred almost fifty years ago, that would hardly be shocking given that seventy-nine-year-old Acoli expressed concern earlier in the hearing about his "memory loss" and fear of possibly having Alzheimer's. Several hours into the questioning, Acoli admitted that he was "getting a little wore down." At the end of the hearing Acoli plaintively stated, "my memory fails me more and more each day; I hope that this won't be held against me. It is common, as years go by, not to remember events in history clearly."

We do not "blindly accept," as the dissent alleges, Acoli's claim that he "blacked out." We do not even credit that account. We merely acknowledge that he has maintained that claim for decades. Nearly five decades from the crime, Acoli's eligibility for parole does not depend on his reciting a version of the events that are acceptable by the Parole Board. As we stated in Trantino VI, an inmate's inadequate or inaccurate recollection of the specifics of his

42

crime does not directly bear on whether there is a substantial likelihood that he will reoffend today and cannot form the basis for denying parole. 166 N.J. at 177-78. That holds true in this case as well.

Acoli had presumptively served the punitive aspect of his sentence by the time he became eligible for parole. See Trantino II, 89 N.J. at 370. Yet, the Board concentrated its attention on the details of the crime to the exclusion of much else, such as his institutional progress over the previous twenty-five years. The Board surely had the right to revisit the terrible deeds that Acoli had done. The Board, however, lost sight that its mission largely was to determine the man Acoli had become. See Greenholtz, 442 U.S. at 10 (citing Sanford H. Kadish, The Advocate and the Expert -- Counsel in the Peno-Correctional Process, 45 Minn. L. Rev. 803, 813 (1961)). The Board's narrow focus obscured the actual issue to be decided -- whether there was a substantial likelihood Acoli would reoffend if released.

<center>2.</center>

At the parole hearing, the Board members expressed no interest in: (1) the approximately 120 courses Acoli completed, including those courses in which he received either a certificate of excellence or in which he graduated with honors; (2) his extensive participation in counseling; (3) his above-average work evaluations; (4) the constructive rapport he displayed with prison

<center>43</center>

staff and inmates; (5) the positive evaluations from the Federal Bureau of Prisons; (6) his assignment to the Honor Unit of his institution; (7) his instruction of younger inmates in a course on Critical Thinking in the federal prison system; and (8) his decades-long infraction-free record.  The Parole Board spent a scant three transcript pages dedicated to Acoli's plan for release.

In contrast, the Board members spent ten transcript pages questioning Acoli on the frivolous subject of the hat he was attempting to purchase and the one he wore on the day of the Turnpike shootings.

The Board's only discussion with Acoli about the therapeutic and educational courses he completed in prison concerned a single program: Criminal Thinking.  That colloquy comprised twelve of the 286 pages of hearing transcript.  Acoli may have taken the course in Criminal Thinking many years earlier, yet he was peppered with questions about the details of the course and what he had learned.  Unsurprisingly, for a man of nearly eighty years, Acoli had difficulty recalling the curriculum of the course -- perhaps no differently than a college graduate would have in attempting to remember long-ago lectures.  Nevertheless, in response to the Board's questions, he explained what he did learn:  "that you don't break the law," you avoid "criminal activity," and you "stay away from violence" -- the precise lessons one would hope an inmate would take away from a prison counseling program.

44

In a similar vein, the Parole Board's December 22, 2016 six-page decision denying Acoli parole made no mention of Acoli's significant accomplishments in prison, his course work, his counseling, his development of occupational skills, and his general efforts at self-improvement. Before the Board was the Federal Bureau of Prisons' well-documented history of Acoli's commendable institutional behavior and accomplishments over decades, and yet the Board contended that Acoli could not "provide any specific tangible examples or explanations of how [he] changed [his] behavioral choices as [he] claimed." (emphasis added).

In response to Acoli's administrative appeal, the Board stated it "reviewed the entire record in rendering its decision" and then cursorily enumerated some generic mitigating factors. The Board, however, never substantively addressed Acoli's twenty-plus-year exemplary institutional record. In this way, the Board paid lip service to the mitigating factors favoring parole set forth in N.J.A.C. 10A:71-3.11(b).

3.

The Board made clear that its decision, in large part, was based on Acoli's performance at the hearing. The Board stated, "you have made negligible gains in understanding your past behaviors, values and attitudes as evidenced by the overall presentation you put forth at the hearing." (emphasis

45

added).  Acoli's answers to the Board evidently animated its decision to deny him parole.  As the Board stated, "[b]ased upon the answers you provided at the hearing, . . . concerns remain that you would commit a crime if released on parole."  Beyond expressing those concerns, the Board's December 22, 2016 decision never explicitly stated that there was a substantial likelihood that Acoli would reoffend if paroled -- the statutory standard governing parole. See N.J.S.A. 30:4-123.53 (1979).

But what were those answers that caused the Board such concern?  One was the speculation demanded from Acoli about who shot Trooper Foerster. Other answers that apparently troubled the Board were Acoli's explanations for joining a radical organization that endorsed violence to achieve social change in the 1960s and 1970s.  As the Board stated in its decision, Acoli recalled watching newscasts at night of "civil rights workers being beaten" and felt "almost the same as though they were beating me," and therefore "wanted to help free black people" to gain "equality."  During the hearing, the Board asked quizzically why Acoli, a well-educated man on the path to success, who had not endured the same hardships as other people of color, would feel impelled to fight for mistreated African Americans who were strangers to him.

Acoli's embrace of a militant radical organization as the vehicle for effecting societal change can be criticized and condemned, especially in light

46

of the violent events on the Turnpike on May 2, 1973. But his reasons for joining the Black Liberation Army, however misguided, did not lack depth, as charged by the Board. And his reasons for now accepting the view that "violence is wrong," does not reflect a lack of insight, as suggested by the Board. Over decades in prison, Acoli's developing awareness that violence is not a necessary means to bring about social change was expressed in a graphic example he gave: the election of President Barack Obama. The Board, however, criticized Acoli for pointing to "an external factor," such as Obama's election, as cause for changing his viewpoint.

The Board stated that Acoli only "superficially condemn[ed] the violence" without giving any articulable basis for its conclusion. The Board rejected Acoli's responses that he was committed to a peaceful way of life, even though he had lived that way of life for decades in prison. The Board expressed concern that, if released, Acoli might face "charged situations regarding social justice and community activism." But Acoli is not required to surrender views abouts "social justice" to be eligible for parole. The Board did not articulate what violent revolutionary organization it feared then-seventy-nine-year-old Acoli might join if paroled.

The Parole Board stated that Acoli's answers "appeared rehearsed in their structure." If that were so, perhaps it was because Acoli had given

47

similar responses at prior parole hearings and to counselors and psychologists over the course of years. The Board also faulted Acoli because his responses "were not spontaneous . . . and often hesitant." But the Board did not account for the fact that Acoli's slowness of speech could be attributable to his age -- a point recognized by the psychologists who interviewed him.

In its decision, the Board also faulted Acoli for "deflecting any acceptance of personal liability or responsibility" for Trooper Foerster's murder. But the record of the parole hearing does not support that finding. Acoli repeatedly accepted responsibility, stating "I'm responsible for [his] death"; "I regret the murder of [Trooper Foerster], and I regret my role in it"; and "I deeply regret his murder, my role in it." Acoli also expressed remorse, stating "I offer my deepest remorse, and sincere apology to Trooper Foerster's family . . . hoping it would be accepted in the spirit offered and provide them a measure of solace and peace."

Beyond belittling Acoli's presentation as "shallow and emotionless," the Board failed to explain what else Acoli might have said to persuade the Board of his sincerity. The Board refused to accept Acoli's words -- and, perhaps more importantly, his deeds, as evidenced by its disregard of his model behavior as an inmate. Lacking in both the Board's questioning at the hearing

48

and in its December 22, 2016 decision was an acknowledgment of Acoli's praiseworthy institutional adjustment and progress over decades.

At oral argument before this Court, the State asserted that just because Acoli was a model inmate did not mean that he would be a model citizen if released. But the standard is not whether Acoli is likely to be a model citizen if released -- it is whether there is a substantial likelihood that he will commit a crime if paroled.

In light of Acoli's verbal renunciation of violence as an acceptable way to achieve social change; more than two decades infraction-free in the federal prison system; the multitude of programs and counseling sessions he completed; his honor status as an inmate; his acquisition of vocational skills; and his advanced age, it is difficult to imagine what else might have persuaded the Board that Acoli did not present a substantial likelihood to reoffend.

4.

The Board's denial of parole to Acoli, moreover, was not supported by the overall psychological risk assessments.

In 1998, Dr. Dudley, a psychologist in the Federal Bureau of Prisons, reported that if Acoli were granted parole, "he evidences the psychological stability required to successfully adjust to life outside of prison." In 2009, the Psychology Services Department of the Federal Bureau of Prisons recorded

that Acoli had "adequate coping skills, an organized approach to completing goals and [an] ability to establish positive interaction with others," and would "be able to transition to the community if paroled." Between 1998 and 2009, Acoli consistently received positive institutional reports.

In advance of Acoli's 2010 parole hearing, the Parole Board assigned Dr. Goorwitz to conduct a psychological evaluation of Acoli. She found that there were "NO psychological contraindications to granting parole," and announced that "it is time to seriously consider [Acoli] for parole." In reaching that conclusion, she determined that Acoli was "very cooperative, self[-]reflective, thoughtful, and non[-] defensive"; "appeared to be answering [questions] honestly"; appeared remorseful; "[took] responsibility for his crimes"; had "demonstrated good conduct" for years in prison; and had shown significant self-growth.

The Appellate Division reversed the Board's 2010 denial of parole based, in part, on Dr. Goorwitz's report. On remand from our Court and in the run-up to Acoli's 2016 parole hearing, the Parole Board retained a new psychologist, Dr. Van Pelt. Dr. Van Pelt made less favorable observations and came to less favorable conclusions than previous psychological assessments of Acoli. In Dr. Van Pelt's view, Acoli's acceptance of responsibility,

50

expressions of remorse, and rejection of violence as a means for social change were not genuine.

Nevertheless, Dr. Van Pelt determined that Acoli presented only a low to moderate risk of recidivism -- and never opined that there was a substantial likelihood that Acoli would reoffend. Instead, echoing language of the current parole statute that is inapplicable to Acoli's case, Dr. Van Pelt found that "Mr. Acoli will likely struggle to abide by the restrictions imposed on him upon release." See N.J.S.A. 30:4-123.53 (stating that an inmate should not be released on parole if he "has failed to cooperate in his . . . own rehabilitation or [if] there is a reasonable expectation that [he] will violate conditions of parole imposed").

In its brief to this Court, the Board states that it "had the benefit of reviewing and considering" Dr. Van Pelt's report, noting that Dr. Goorwitz's evaluation was administered six years earlier. The Board asserts that Van Pelt's report "is unquestionably less favorable to Acoli than the 2010 evaluation" and that "it properly 'played an indispensable part in the Board's final decision,'" quoting Acoli, 462 N.J. Super. at 60.

In the end, however, even Dr. Van Pelt's report does not support the Board's denial of parole. Her low-to-moderate-risk assessment concerning the likelihood of Acoli's recidivism does not equate to a substantial likelihood of

51

committing a crime. A single unfavorable psychological evaluation finding only the "potential" to reoffend is insufficient to support the denial of parole. See Cestari, 224 N.J. Super. at 550. The Board, moreover, may not rely on a single unfavorable psychological report, in disregard of evidence favorable to parole, to reach a preferred outcome. See Trantino VI, 166 N.J. at 174, 188; see also Cestari, 224 N.J. Super. at 550.

5.

Acoli's advanced age -- seventy-nine at the time of the hearing (and eighty-five today) -- is another highly relevant factor in determining whether the Board abused its discretion in denying parole.

Studies have shown that as individuals age, their propensity to commit crime decreases and, in particular, that elderly individuals released from prison tend to recidivate at extremely low rates. See generally Nat'l Rsch. Council, The Growth of Incarceration in the United States: Exploring Causes and Consequences 155 (Jeremy Travis, Bruce Western & Steve Radburn eds., 2014) ("[R]ecidivism rates decline markedly with age."); see also U.S. Sent'g Comm'n, The Effects of Aging on Recidivism Among Federal Offenders 3 (2017), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf (finding that that "[o]lder offenders were substantially less likely than younger

offenders to recidivate following release"); N.J. Dep't of Corrections, State Parole Bd., Juv. Just. Comm'n, Release Outcome 2007: A Three-Year Follow-Up 15 ("Multivariate statistics indicated that age was inversely related to the odds of rearrest; for every one-year increase in age, the offender's odds of a new arrest decreased by a factor of .95.").

Significantly, inmates released at age sixty-five or older had only a 6.5 percent rate of incurring a new conviction and only a 4.1 percent rate of reincarceration. U.S. Sent'g Comm'n at 23. Acoli is in an advanced age group for which there is not a comparable statistical cohort. Suffice it to say, a 4.1 percent rate of reincarceration -- without regard to any other factors that might militate toward denying parole -- can hardly equate to a substantial likelihood of reoffending.

Nothing in the Parole Board's decision suggests that the Board considered in any meaningful way the studies on the age-crime curve in denying parole to Acoli.

## VI.

We conclude that the Parole Board's decision to deny Acoli parole is not supported by substantial evidence in the record or by a reasonable weighing of the relevant factors in N.J.A.C. 10A:71-3.11(b) that govern parole. See Trantino IV, 154 N.J. at 24. Even under the most deferential standard of

53

review, the Board has failed to prove by a preponderance of the evidence that there is a substantial likelihood that, if released on parole, Acoli will commit a crime. Indeed, the Board's decision is so wide of the mark and "manifestly mistaken" that the "interests of justice" require our intervention. See Trantino VI, 166 N.J. at 192 (quoting P.F. v. Div. of Developmental Disabilities, 139 N.J. 522, 530 (1995)). We therefore order that Acoli be released to live with his daughter and grandchildren in their home in accordance with his parole plan.

The record today is not substantially different from the record developed in 2010. Based on that record, a unanimous panel of the Appellate Division ordered Acoli's release on parole in 2014. Now, however, Acoli is eighty-five years old, in infirm health, and no longer employable.

Our order releasing Acoli on parole does not absolve him of the senseless crimes he committed almost fifty years ago. He is not released out of sympathy or compassion. He must be released because the statutory standards for granting parole have been met. Neither the Parole Board nor this Court has discretion to suspend the law in a special case.

Despite Acoli's forty-nine years of imprisonment, his many years of good behavior, and his expressions of remorse, we understand that no punishment will right the wrong of Trooper Foerster's death, requite the loss to

Trooper Foerster's family, or assuage their pain. Trooper Harper too is left with lifelong psychic and physical scars from his wounding. We acknowledge that if Acoli were convicted today of the crimes he committed in 1973, he would be condemned to serve life imprisonment without the hope of parole. See N.J.S.A. 2C:11-3(b)(2); see also Trantino VI, 166 N.J. at 196-97.

However much we may abhor the terrible crimes that Acoli committed, he was sentenced and punished according to the law in effect at the time of his offenses -- and he is protected by that same law, the law that we are duty-bound to uphold, the law that gives him the right to be paroled today. See Trantino VI, 166 N.J. at 197. We are not unmindful of the passions aroused by a sensational case of this nature and the immense pressures that come to bear on dutiful public officials. But neither government agencies nor our courts can bow to public outrage in enforcing the law. Even the most scorned member of our society is entitled to be sheltered by the protection of the law, no matter how hard and vengeful the winds of public opinion may blow.

This case is not just about Sundiata Acoli. It is also about our commitment to the rule of law. In issuing our decision today, we fulfill that commitment, as we must, without regard to any extraneous factor, such as sympathy or passion or public opinion.

55

## VII.

For the reasons expressed, we reverse the judgment of the Appellate Division majority, which affirms the Parole Board's denial of parole to Acoli. We hold that the Parole Board arbitrarily and capriciously exercised its power in failing to grant Acoli parole in accordance with N.J.S.A. 30:4-123.53. We therefore order Acoli's release to live with his daughter in her home consistent with his parole plan, subject to all appropriate supervisory conditions, provided that no material change of circumstances has occurred since the parole plan was established.

JUSTICE PIERRE-LOUIS and JUDGE FUENTES (temporarily assigned) join in JUSTICE ALBIN's opinion. JUSTICE SOLOMON filed a dissent, in which JUSTICE PATTERSON joins. CHIEF JUSTICE RABNER did not participate.

Sundiata Acoli, a/k/a
Clark Edward Squire,

Appellant,

v.

New Jersey State Parole Board,

Respondent.

JUSTICE SOLOMON, dissenting.

In evaluating decisions made by the Parole Board, we defer to the expertise of the Board. We "intervene only if we are thoroughly convinced that a miscarriage of justice has occurred. . . . [A]ppellate judges have no monopoly on justice." Trantino v. State Parole Bd., 166 N.J. 113, 200 (2001) (Baime, P.J.A.D. (temporarily assigned), dissenting).

I.

A.

It is undisputed that in May 1973, Sundiata Acoli participated in the murder of State Trooper Werner Foerster and assaulted Trooper James Harper on the New Jersey Turnpike. Acoli and his two passengers, James Coston and Joanne Chesimard, all members of the Black Liberation Army (BLA) -- a radical anti-government militant organization -- initiated a firefight with the

1

Troopers. Trooper Foerster searched Acoli, found an automatic pistol, and alerted Trooper Harper, who then ordered Coston and Chesimard to put their hands on their laps. Chesimard disobeyed the order, produced a weapon, and shot Trooper Harper in the shoulder. As Chesimard attacked Harper, Acoli initiated a physical struggle with Trooper Foerster and then grabbed his pistol. Trooper Foerster was shot twice with Acoli's weapon and then twice more in the head with his own weapon. Trooper Foerster died from his injuries.

Acoli was convicted by a jury of murder, atrocious assault and battery, assault and battery, assault with an offensive weapon, assault with intent to kill, illegal possession of a weapon, and armed robbery. He was sentenced to life in prison for the murder conviction and to consecutive sentences totaling twenty-four to thirty years for the other crimes.

### B.

In 2010, Acoli became eligible for parole for the third time. A two-member Board panel conducted a hearing and denied Acoli's request. Acoli appealed to the full Parole Board, which affirmed the two-member panel decision based on a paper record. The Appellate Division then reversed the full Board's decision and ordered that parole be granted.

We reversed the Appellate Division's judgment and remanded the case to the Board to conduct a full hearing. Acoli, 224 N.J. at 217. Accordingly,

2

on June 8, 2016, the full twelve-member Board conducted a six-and-a-half-hour in-person parole hearing. The Board asked "numerous questions regarding [Acoli's] current state of mind on societal and social topics and [his] view[s] and perception of [his] participation in the murder of [Trooper Foerster] and how [he] believe[s] programming/counseling has assisted [him] in gaining any insight into the reasons for [his] violent criminal behavior." The Board asked Acoli about his affiliations with the Black Panther Party and the BLA in the 1960s and 1970s. Acoli was an active member of the BLA at the time he murdered Trooper Foerster on the New Jersey Turnpike.

The Board then asked Acoli questions about his version of events leading up to Trooper Foerster's death. Acoli, consistent with his claims at prior proceedings, maintained that Trooper Foerster hit him in the face several times with his gun. Once gunfire broke out on the other side of his car, Acoli "grabbed [Trooper Foerster's] pistol," and in response, Trooper Foerster shot Acoli in his hand. Acoli further claims that while he physically struggled with Trooper Foerster, Trooper Harper shot him on the top of his head. Acoli said his head wound was bleeding so badly that he couldn't see while trying to flee the scene. Following Acoli's account of the events, the members probed him about the numerous inconsistencies between Acoli's version and the police reports:

3

Q. But I'm looking at the pictures here when you were taken into custody, and there are no marks on your face . . . . [W]hy don't [you] think you had marks on your face if somebody pistol-whipped you?

A. Because, uh -- okay, the first time he hit me, he hit me with the flat of the gun . . . up the side of [my] temple. And then -- and the next ones, I kind of -- kind of blocked it . . . . And by then, uh, a little shortly after that, the gunfire broke out on the other side of the car[.]

Q. But you also said [Trooper Foerster] shot you [in your hand].

A. Yeah, he did[.]

. . . .

Q. [Trooper] Foerster's gun was a six-shot Colt revolver . . . and only had two spent rounds in the cartridge, and both of those bullets were . . . taken out [of] his head . . . . There was no third shot, sir.

A. Then, uh -- I don't know, you know.

. . . .

Q. [Y]ou're claiming that . . . Trooper Harper shot at you?

A. Yes[.]

Q. Okay.

A. [Trooper] Harper hit me in the head with the gunshot.

. . . .

4

Q. [But] [t]here's no reference to [your head wound] in the trial record. Why is that?

. . . .

A. [A]t the time I went to trial[,] . . . [my lawyer] was useless.

. . . .

Q. "[Trooper Foerster] had head bore abrasions on the left cheek, lacerations at the top of the forehead, the mid forehead, and the left side of the head . . . . He had bruises and abrasions on both hands." Upon your arrest, "[t]he only injury found was a cut on the webbing between [your] right thumb and forefinger. Otherwise, [you were] unmarked and uninjured."

A. All I know is [Trooper Foerster] assailed me.

. . . .

Q. Well, then how did he have so many bruises and bumps, and you only [had] one?

A. I had more, they weren't -- they didn't record those.

Q. You think they're lying [about your injuries]?

. . . .

A. They're lying about it.

Throughout the hearing, the Board questioned Acoli about who shot and killed Trooper Foerster. Although Acoli claimed to take responsibility for his crimes, he maintained that he did not murder Trooper Foerster, and said, "[he]

5

did not put the bullets in his head." Rather, Acoli asserted that he "blacked out" after he was grazed by a bullet from Trooper Harper's weapon. Then, in an effort to assess whether Acoli truly accepts responsibility for Trooper Foerster's murder, the Board asked him to speculate as to who killed Trooper Foerster. In response, Acoli said Trooper Harper "probably shot" Trooper Forester with "friendly fire" while Acoli struggled with him.

In an effort to understand Acoli's rehabilitative efforts, the Board inquired about who Acoli was in 1973 and who Acoli was at the time of the hearing. Acoli responded that in 1973 he was involved in a movement to free black people and that, if violence was necessary to achieve that goal, then he would engage in such conduct. However, Acoli now maintains that he is older and "hopefully wiser," and realizes that "change can be attained by nonviolent means." When asked to elaborate on why he so dramatically changed his views, Acoli said the election of President Obama influenced him greatly. The Board immediately questioned Acoli's candor by reminding Acoli that in 2004, four years before the election of President Obama, he told the Board he did not believe in violence as a means to achieve social change. Acoli also did not deny that after his last parole hearing he approached a prison staffer about receiving counseling on how to sound more convincing.

6

The Board also asked Acoli about the website created in his name. Acoli said it was created by a man and his wife who consider Acoli to be a political prisoner of war. Acoli was then asked if he considers himself to be a political prisoner, to which Acoli responded in the affirmative.

## C.

Following Acoli's lengthy and detailed interview, the Board concluded by a preponderance of the evidence that there is a substantial likelihood that he will commit a crime if paroled at this time. The Board found that he "emotionally blocked any association" with the murder "by deflecting any acceptance of personal liability." The Board remarked that at his hearing, Acoli chose to deviate from his past statements and speculate that Trooper Harper killed Trooper Foerster by friendly fire. Acoli so speculated knowing that the ballistics evidence directly contradicts his theory.

Recognizing that Acoli considers himself to have been a political prisoner at the hands of the State for nearly fifty years, the Board explained its concern that upon release, Acoli may be faced with "charged situations regarding social injustice and community activism." The Board could not confidently conclude that Acoli is rehabilitated to the point where he will not give in to social pressures and return to his past violent behavior.

7

Lastly, the Board relied on the most recent psychological evaluation conducted by Dr. Julia Van Pelt in April 2016. Dr. Van Pelt noted that Acoli's responses seemed disingenuous and that he demonstrates a lack of remorse. She also found it concerning that Acoli believes he and his co-conspirators were "targeted" by the troopers due to their race and that he "attributes blame for the incident to the officers."

## D.

Acoli appealed, and a divided Appellate Division affirmed the Board's decision, finding the new record to be "more developed." Acoli v. State Parole Bd., 462 N.J. Super. 39, 43 (App. Div. 2019). The majority applied the appropriate standard of review, emphasizing "the subjective nature of the Board's prediction of an inmate's future behavior, and the highly specialized composition of the Board itself." Id. at 51.

## II.

We begin our discussion with a review of the Parole Board's unique functions. The Parole Board "is the administrative agency charged with the responsibility of deciding whether an inmate satisfies the criteria for parole release under the Parole Act of 1979." In re Application of Hawley, 98 N.J. 108, 112 (1984). The Board's primary concern is recidivism, and it "is expressly charged by the Legislature to withhold release when it does not have

8

the opinion that there is reasonable probability that the inmate will be law-abiding." Beckworth v. State Parole Bd., 62 N.J. 348, 360 (1973).

The Parole Act of 1979, N.J.S.A. 30:4-123.45 to -123.79, governs Acoli's parole process and provides for the parole of an eligible inmate unless the Board finds by a preponderance of the evidence that "there is a substantial likelihood that the inmate will commit a crime under the laws of this State if released on parole at such time." N.J.S.A. 30:4-123.53 (1979). In making that determination, the Board is required to consider a nonexclusive list of factors, including the facts and circumstances of the offense; any aggravating and mitigating factors; "documented changes in attitude toward self or others"; the inmate's "motivation for law-abiding behavior"; and "statements by the inmate reflecting on the likelihood that he or she will commit another crime." N.J.A.C. 10A:71-3.11. The Board is also allowed to consider any non-regulatory factors deemed relevant. Ibid.

"Common sense dictates that [the Board's] prediction as to future conduct and its opinion as to compatibility with the public welfare be grounded on due consideration of the aggregate of all of the factors which may have any pertinence." Beckworth, 62 N.J. at 360. There is also no statute or regulation that requires the Board to weigh any of the factors more heavily than others. See N.J.A.C. 10A:71-3.11. Rather, the Board is tasked by the

9

Legislature to make value judgments by assessing the facts in the record and its personal observations of the inmates before it. Trantino, 166 N.J. at 201 (Baime, P.J.A.D., dissenting). Accordingly, the Board's decision turns on "discretionary assessment[s] of a multiplicity of imponderables entailing primarily what a man is and what he may become rather than simply what he has done." Ibid. (alteration in original) (quoting Greenholtz v. Inmates of Neb. Penal & Corr. Complex, 442 U.S. 1, 10 (1979)).

We will reverse a decision of the Parole Board "only if it is arbitrary, capricious, or unreasonable or [if] it is not supported by substantial credible evidence in the record as a whole." Henry v. Rahway State Prison, 81 N.J. 571, 579-80 (1980). While the Board has the opportunity to make an informed decision after hearing and seeing live testimony, we only "review cases based on transcripts, documents and briefs submitted," and "[t]he voluminous records do not always accurately depict what occurred below." Trantino, 116 N.J. at 200 (Baime, P.J.A.D., dissenting). Therefore, we are required to accord deference to decisions made by the Parole Board as we do to any finder of fact. See, e.g., In re License Issued to Zahl, 186 N.J. 341, 353 (2006) ("Courts generally afford substantial deference to the actions of administrative agencies such as the Board [of Medical Examiners]. . . . because of the expertise and superior knowledge of agencies in their specialized fields.") (quotation

10

omitted)); In re Robertelli, 248 N.J. 293, 313 (2021) (noting in the context of attorney discipline cases that appellate courts "are left to survey the landscape of a cold record" and therefore determining that, "[a]lthough we are the final triers of fact in a disciplinary matter, a special master's credibility findings are generally entitled to some level of deference."); DYFS v. F.M., 211 N.J. 420, 448-49 (2012) ("It is not our place to second-guess or substitute our judgment for that of the family court . . . ."); State v. Scriven, 226 N.J. 20, 32-33 (2016) ("[W]e must respect factual findings that are supported by sufficient credible evidence at the suppression hearing, even if we would have made contrary findings had we sat as the motion court.") (quotation omitted)).  It is not our role to substitute our judgment for that of the Board.

III.

As in State v. Lodzinski, the majority is once again doing "the opposite of what our law requires."  249 N.J. 116, 162 (2021) (Patterson, Fernandez-Vina, and Solomon, JJ., dissenting).  Rather than affording the Board the substantial deference to which it is entitled, the majority probes the record for evidence favorable to Acoli.  "The majority thus substitutes its own interpretation of the" record for that reached by the finder of fact -- the Board.  Ibid.

11

With the exception of this Court's decision in Trantino, we have never so jadedly scrutinized a decision by the Parole Board in the way the majority does today. The Parole Board formed its decision by reasonably relying on the record as a whole as well as the observations from its members during Acoli's parole hearing. The Legislature tasked the Parole Board with the responsibility of using its expertise to determine whether an inmate is fit for parole through a process that we require the Board to follow. See Acoli, 224 N.J. at 217. Our only role is to ensure that the Parole Board does not abuse its discretion in making its decisions. In light of the Board's evident consideration of the record as a whole -- through evaluating Dr. Van Pelt's report, speaking face-to-face with Acoli for six hours, and reviewing the paper record -- we cannot say we are in a better position than the Parole Board to decide Acoli's fate.

A.

In its six-page decision, the Parole Board explained in detail its reasons for finding by a preponderance of the evidence that "there is a substantial likelihood that [Acoli] will commit a crime . . . if released on parole" at this time. See N.J.S.A. 30:4-123.53 (1979). In doing so, the Board relied on the factors enumerated in N.J.A.C. 10A:71-3.11, along with other factors the members deemed relevant. See Williams v. State Parole Bd., 336 N.J. Super.

12

1, 8 (App. Div. 2000) (finding "that the Parole Board may also consider whether the inmate has sincerely avowed responsibility for his crime"). Based on the Board's thorough decision, we can infer which factors contributed to its reasons for denying Acoli's parole. In analyzing the record as a whole, the Board came to a well-supported conclusion.

1.

In relying on factor five -- "[f]acts and circumstances of the offense," N.J.A.C. 10A:71-3.11(b)(5) -- the Board spent a great deal of time recalling the murder of Trooper Foerster with Acoli. The Board stressed that Acoli and his passengers were all members of the BLA -- "a radical anti-government, militant organization that perpetrated violent crimes, including bombings, bank robberies and murders in order to effect change to what members viewed as social oppression/discrimination occurring."

It was further highlighted that the jury convicted Acoli of murdering Trooper Foerster with his own weapon in cold blood. The jury found that Acoli took Trooper Foerster's weapon, stood over him, and shot him twice in the head. We previously emphasized that "Acoli committed the most heinous crime . . . which, if committed today, would result in a life sentence without parole eligibility." Acoli, 224 N.J. at 234. This Court has long held the belief that murdering a police officer is a particularly horrific crime. See State v.

13

<u>Nelson</u>, 155 N.J. 487, 516 (1998) (explaining that killing a police officer in the line of duty is "one of the worst crimes known to our law"); <u>see also</u> <u>State v. Serrone</u>, 95 N.J. 23, 27 (1983) ("Murder is the most heinous and vile offense proscribed by our criminal laws."). Therefore, the Parole Board appropriately considered the facts and circumstances of the offense as one of the factors in denying Acoli parole.

<p align="center">2.</p>

In inquiring about Acoli's current views of violence, the Board considered factor eleven -- "[d]ocumented changes in attitude toward self or others," -- and factor twelve -- "[d]ocumentation reflecting personal goals, personal strengths or motivation for law-abiding behavior." <u>See</u> N.J.A.C. 10A:71-3.11(b)(11), (12). After extensively questioning Acoli for six hours, the Board found that Acoli still has the mindset of a radical.

Although he claimed to condemn violence as a means to achieve social change, when asked to elaborate on why he had so dramatically changed his views, he said the election of President Obama influenced him greatly. However, the Board immediately questioned Acoli's candor by reminding him that in 2004, four years before the election of President Obama, he said he no longer advocated for violence. In its decision, the Board found that Acoli "cite[d] [his] non-violent thoughts today, with no explanation as to how

<p align="center">14</p>

specifically [he] changed [his] thought process . . . . [T]he superficiality in which [he] present[ed] [him]self casts doubt on the genuineness of [his] endorsement of values that [he] once possessed."[1]

In its decision, the Board stressed that "[b]ecause the nature and circumstances of the underlying offense involved [Acoli's] participation in a radical organization, the manner in which [he] will conduct [himself] and address and process confrontational situations or situations involving societal conflict were important aspects of the Board's decision in assessing the possibility" Acoli might engage in future criminal behavior. The Board expressed concerns that Acoli will encounter charged situations, and it believed that Acoli would succumb to social pressures and return to his violent past. The Board's conclusion is also supported by the fact that after nearly fifty years, Acoli still considers himself to be a political prisoner and refuses to denounce a website made in his name that casts him as the victim in the gun battle that resulted in the death of Trooper Foerster.

---

[1] The Board's concern about Acoli's genuineness also supports a finding that the Board considered factor seventeen -- "[s]tatements by the inmate reflecting on the likelihood that he or she will commit another crime." N.J.A.C. 10A:71-3.11(b)(17). The members found Acoli's statements incredible based on his demeanor and the manner in which he responded to their questions, a conclusion that we have long left to the finder of fact. See, e.g., Robertelli, 248 N.J. at 313.

15

Furthermore, during his interview with Dr. Van Pelt, Acoli recounted his version of events leading up to Trooper Foerster's death. Acoli expressed to Dr. Van Pelt that he was still convinced that if Trooper Foerster had shot him, Trooper Foerster "would have gotten a medal." The record as a whole suggests that Acoli's bald assertion that he decries violence was not genuine.[2]

3.

The Board also properly considered that, even after almost five decades, Acoli still does not claim responsibility for the murder of Trooper Foerster. Not only does Acoli maintain that he did not commit the murder, but he continues to claim that Trooper Foerster shot him in the hand and that Trooper Harper's shot grazed his head. Acoli continues to relay this version of events even though the ballistics evidence and police reports completely discredit his story. And when pressed by the Parole Board, Acoli speculated that Trooper Harper killed Trooper Foerster with "friendly fire." That theory is also wholly unsupported by the evidence and further demonstrates that Acoli advances only fabrications that absolve him of responsibility.

---

[2] The majority's finding that "[t]he parole hearing had little to do with the man who appeared before the Board," is unsupported by the record. Ante at ___ (slip op. at 5). The Board probed Acoli at length about his time in prison, his completion of institutional programs, and his current views towards violence.

Although Acoli said he takes responsibility for Trooper Foerster's death, he simultaneously cast himself as the victim in the incident and recounted a theory that the evidence completely discredits. See Trantino, 166 N.J. at 216 (Baime, P.J.A.D., dissenting) ("In assaying the prospects for recidivism, the Parole Board must look to the man as well as to the offense, and it is here that the inmate's attitude toward the truth is highly relevant."); see also In re Shaputis, 265 P.3d 253, 269 (Cal. 2011) (explaining that in considering parole, "an implausible denial of guilt may support a finding of dangerousness . . . . In such a case it is not the failure to admit guilt that reflects a lack of insight, but the fact that the denial is factually unsupported or otherwise lacking in credibility"). In denying him parole, the Board properly exercised its discretion in considering Acoli's misrepresentation that he takes responsibility for his actions.

### B.

This case is not about how we, as members of the Court, would have assessed the facts as members of the Parole Board. Our sole task is to determine whether the Parole Board abused its discretion under a very lenient standard of review. We would find that it did not.

The majority is once again choosing to value its interpretation of a cold record over the Board's determination as the fact-finder. See Lodzinksi, 249

17

N.J. at 158; Trantino, 166 N.J. at 121-22. Without considering that the evidence clearly shows that a bullet never grazed Acoli's head, the majority remarkably chooses to blindly accept Acoli's assertion that he "blacked out" and does not recall who murdered Trooper Foerster. See ante at ___ (slip op. at 19-20). By refusing to acknowledge that Acoli's version of events is clearly fabricated, the majority finds, relying on Trantino, that a lack of memory supports granting parole.[3] See Trantino, 166 N.J. at 178 ("[T]he Board's reliance on Trantino's inadequate recollection of the details of his crimes to support its denial of parole constituted a clear abuse of discretion . . . .").

The majority also criticizes the Board's decision to rely solely on Dr. Van Pelt's psychological report. However, it is entirely within the Board's discretion to determine which psychological reports, if any, it considers in making its decision. In this case, the Board chose to consider the most recent psychological report conducted in April 2016, rather than the report conducted by Dr. Goorwitz in 2010.

---

[3] Although Acoli claims a lack of recollection of Trooper Foerster's murder, his assertion that he "blacked out" as a result of being grazed in the head by a bullet is wholly unsupported by the evidence. The import of the Board's conclusion is that Acoli's version of the events is clearly feigned. We do not believe such an inference to rise to the level of an abuse of discretion. Our colleagues' acceptance of Acoli's version is simply inconsistent with principles of appellate review.

18

Further, although the majority accuses the Board of having a "narrow focus" that "obscured the actual issue to be decided," ante at ___ (slip op. at 43), the Board considered the record as a whole as well as its observations during the six-hour hearing. In fact, the Board noted several mitigating factors: Acoli's advanced "age and personal and medical histories," his "record of rehabilitative program participation (including each of those programs reflected in [Acoli's] appeal)," and his "infraction-free status (since his last Board panel hearing)." The Board also considered Acoli's plans if he were to be let out on parole. Contrary to the majority's contention that the Board failed to consider Acoli's "well-documented history" and "commendable institutional behavior," ante at ___ (slip op. at 45), the record reveals that the Board considered those positive factors. However, Acoli's successful completion of institutional programs does not mean the Board is now forced to accept Acoli's blanket statements denouncing violence.

Removing the Board's ability to evaluate the sincerity of an inmate's presentation would be stripping the Board of one of its core responsibilities. See Trantino, 166 N.J. at 200 (Baime, P.J.A.D., dissenting) (finding that we are "required to accord deference to the findings of the [parole board] that [is] substantially influenced by its opportunity to hear and see the witnesses and to have the feel of the case, an opportunity which a reviewing court cannot

19

enjoy") (quotation omitted)). Considering the record as a whole, the Board appropriately found that these mitigating factors were simply outweighed by the aggravating factors, particularly Acoli's "insufficient problem resolution."

IV.

By disregarding the Parole Board's reasoned decision, the majority fails to uphold our longstanding precedent to accord the fact-finder substantial deference. Ante at ___ (slip op. at 56); see Lodzinksi, 249 N.J. at 158; Trantino, 166 N.J. at 121-22. In our view, the majority diminishes the role of the Parole Board by making this Court the finder of fact. We consider that decision a disrespect to our fundamental principles of appellate review and a grave injustice to the victim, State Trooper Werner Foerster, and his family. See N.J. Const. art. I, ¶ 22. We dissent.